MARY G. BROWN, appellant,

*v.*

GEORGE T. BROWN, respondent.

[Filed November 15th, 1901.]

1. The testimony of the witnesses sworn on behalf of the petitioner, as to the charges of adultery against the defendant, upon which the decree below is founded, considered to bear evident marks of improbability and exaggeration, and *held* to have been fully met and disproved by the proofs of the defendant. And *held, also,* that the evidence relating to the prior conduct of the defendant, introduced by the petitioner for the purpose of showing an alleged adulterous disposition on her part toward the co-respondent, failed to establish such a charge.

2. The rule stated in *Berckmans* v. *Berckmans, 1 C. E. Gr. 122,* that "the testimony of one witness uncorroborated, unsupported and in its details improbable, is not sufficient to establish the charge of adultery against the full and explicit counter testimony of the person accused and her *particeps criminis,*" approved.

3. In cases depending upon circumstantial evidence for support, the will to commit the adulterous act, as well as the opportunity for its commission, must be established.

4. While in a suit for divorce for adultery by a husband against the wife, his conduct in designedly encouraging and furnishing occasions and opportunities for suspicion against her may not constitute such connivance by him as to be legally sufficient to bar him from his right to maintain his suit, yet his conduct may serve to explain and excuse the appearances of intimacy into which she thereby became involved, and out of which the charges of adultery against her arose.

---

On appeal from a decree advised by Vice-Chancellor Pitney, whose opinion is reported in *17 Dick. Ch. Rep. 29.*

*Mr. Isaac S. Taylor,* for the appellant.

*Mr. Flavel McGee,* for the respondent.

The opinion of the court was delivered by

VREDENBURGH, J.

This litigation was commenced on November 15th, 1898, by a petition of the husband, praying for a decree of divorce against the wife, filed under the divorce provisions of our statute, and based upon the alleged commission, by the wife, of adulterous acts, charged to have been committed with a designated person at the localities of Bogota, Jersey City and Red Bank, in this state, during a period of four and a half months, viz., July, August, September, October and the first half of November, 1898. The large volume of facts in evidence (taken before a master, and covering, with the opinion below, irrespective of briefs of counsel, nearly five hundred printed pages) render it a practically impossible task, within the proper limits of this opinion, to deal either with all the minutiæ of the case or with all the reasons which might be advanced for the conclusion now arrived at. This course is the less to be regretted because it makes possible the omission of many forbidding details of the evidence, which otherwise would unnecessarily encumber our reports, and tend to gratify prurient curiosity, rather than to accomplish useful results. I shall therefore condense the bounds of this opinion without, however, I hope, slighting any of the material features of the case, which have been so thoroughly and laboriously presented in the opinion below.

There are but two occasions when it can be claimed, under the evidence, that adulterous acts were committed by the defendant. The *first* of these events is said to have taken place in the house and home where these parties and their children lived—82 Glenwood avenue, Jersey City—on some night in the month of October, 1898 (the evidence of the time or date being extremely confused and indefinite) ; the *second* event is alleged to have happened on the night of November 5th, 1898, at the private dwelling-house and home of Mr. Graham Van Keuren,

in the town of Bogota, New Jersey. The *first* charge depends for support entirely upon the credit that should be given to the testimony of a single witness, a servant woman, named Maria Mitchell; and the *second* accusation depends solely upon the credit that should be attached to the testimony of a single witness, an avowed detective, named James A. Coyne.

The initial question of fact to be met is: Was adultery committed on the first occasion above named? Is Maria Mitchell's testimony entitled to belief? As she acknowledged that she was under the pay and employ of the petitioner at the time she claimed to have seen the acts of which she speaks, as well as at the time of her examination as a witness in this cause, it will be admitted that her statements in favor of her employer should be subjected to the most careful scrutiny. She was an interested witness and vitally essential to the petitioner's success as to the charge she was relied upon to sustain. While it is well settled in this state that the testimony of a single witness may be sufficient proof of adultery to sustain a decree of divorce, though denied by the defendant upon oath, yet it is held that "such effect must depend upon the probability of the story, the character of the witness and the consistency of his [or her] evidence."

The intelligence of this witness is well criticised in the opinion below, finding that she, to use its language, "is somewhat stupid, very illiterate, cannot read and has a poor command of language." In adopting that estimate of her intelligence I shall add also that it appears by the record that she was so ignorant that she could not write her name, but affixed, at the end of her testimony, her cross-mark instead, stating to the master that she could not write her name. I attach some importance to this fact, because it gives a needed inkling of her origin and character, or rather want of character, because all information as to her previous history she persistently denied to the cross-examiner. A brief transcript of a portion of her testimony will show this, as follows:

"*Q.* How old are you?
"*A.* I don't know.
"*Q.* How long have you been in this country?
"*A.* I can't tell you; I'll have to find out.

Brown *v.* Brown.

"*Q.* Are you from Ireland?
"*A.* I don't know where I am from.
"*Q.* Are you married?
"*A.* I don't know."

This last answer certainly caps a climax of agnosticism. The affirmative evidence of her antecedents being so meagre, we are forced to regard the negative side of the inquiry. How does it happen that the petitioner and his experienced counsel suffered a witness (so important to his case) to leave her testimony on the subject of her character in such doubtful shape on the record? We can understand that, in her direct examination, the party calling her could safely stand upon the usual presumption of her good character until it was questioned, but after it had been attacked in her cross-examination, and she had refused to answer proper questions affecting it (only a part of which I have above quoted), what reason could the petitioner's counsel have had, upon her redirect examination, for avoiding that subject? If she had come from respectable associations or surroundings, it seems to me that counsel would have been quick to respond to the challenge offered by the other side, and prompt to strengthen her questioned antecedents. In this condition of the record I think her previous character must be regarded with great suspicion, and that her evasive answers as to her identity were probably due to a fear of disclosing that she had been employed through Coyne, the detective, and for an ulterior purpose, hereafter referred to.

But the probability of the story Mitchell tells, of what she claims to have observed as to the conduct of the defendant and co-respondent, provokes, from every point of view, still greater suspicion. In the first place, her identification of the affair to which she pretends to speak, so far as any date is concerned, is very unsatisfactory, if not disquieting. In her main examination she was permitted to answer the following leading question, itself suggestive of a fear of the witness' ability to fix any time unless assisted by the form of the question, viz., "*Q.* Now tell us what happened on a Thursday night about a month after that?" The words "after that" in this question seem to have reference to an occasion when the witness had said, in her pre-

vious answer, that Mrs. Brown and Mr. Cane had attended the theatre. It appeared in the case that they attended the theatre together on two occasions, viz., on October 1st and on October 15th, 1898. · In her cross-examination she swore that she could not say whether the incident she refers to occurred two months after these persons went to the theatre or not, and in another part of her testimony she swore that she "was not really sure whether it was in October or in September." This important date, fixed in such an ambulatory manner by this witness, can only be the subject of conjecture from her testimony. In the opinion below it was thought that the witness must have referred to some period between October 1st and the 14th, 1898. Adopting that, we proceed to her other statements of the circumstances surrounding the affair of which she speaks. She swore, on her cross-examination, and not until then, that on that occasion Mrs. Graham Van Keuren (who had brought with her her little girl) and her brother, the co-respondent, and Mr. John R. Ramsey, the clerk of Bergen county and a counsellor-at-law of this state, and the defendant were in and about the parlor and the two adjoining rooms on the parlor floor of 82 Glenwood avenue house, at a time in the evening which she could not fix, because, she said, she "didn't look at the clock." This time must have been earlier than ten o'clock at night, as will soon appear. ' She admits that there was "a bright light" in the hall adjoining the parlor and a "pretty bright light" in the parlor; that there was a "low light" in the middle room and another "low light" in the back room; that the doors between the parlor and the middle room were double doors and were open, and that the doors between the middle room and the back room were also double doors and were open. She had, in her chief-examination, stated that she "opened the door unexpectedly between the hall and the back room" when she went to it. On her cross-examination she made a very significant change in her previous statement, and said that she did not open that door; that it was already "partly open" when she went there, and in another portion of her testimony she termed it "a little open;" that she had a message from the kitchen (which was below) to Mrs. Brown, to the "floor" (parlor), "something about the breakfast;" that she

Brown *v.* Brown.

looked through that partly-open door which opened from the hall to the back room, and through that opening there saw defendant and co-respondent on a lounge in a compromising position. She also said that Mr. Ramsey and Mrs. Van Keuren were in the parlor at that time and Mr. Cane and defendant were in this back room. The position of the lounge, in respect to the door through which she said she looked, she did not give other than to answer, when asked on what side of the wall of the room it stood, "I don't know; I didn't pass no remarks on which side." How much of this story was true and how much was false or exaggerated we have to determine. I have no doubt that most of it was correct. The fabrication was not probably in the foundation of the incident, but consisted in her exaggerations respecting the positions of the persons, whom she desired to implicate in the adulterous charge she was endeavoring to support by her testimony.

It is probably within the experience of every trial lawyer and of every judge that willing witnesses, and even corrupt ones, unless they are phenomenal falsifiers, have a foundation of fact upon which they build their fabrications, and that their fabrications are apt to consist of distortions of the actual facts. It is quite likely to have been the truth, and indeed is not denied, that Mr. Cane and the defendant, at some time during the course of that evening, were in the back room together, but that they were at any time in an improper situation there or upon any lounge in such condition is explicitly denied, not only by each of them, but also by both Mrs. Ramsey and Mr. Ramsey. With four oaths against one, we are justified in looking with the greatest care at the probabilities of the truth of the incriminating part of this woman's story. The time to which the witness would have us refer must have been before ten o'clock in the evening, because Mitchell says that she usually went to bed at ten. Her bed was in a servant's bedroom above the parlor floor. The two servants were downstairs, and were liable to come up to the parlor floor at any moment for instructions, or with messages from the kitchen about breakfast, and Mitchell swore she, in fact, did come on such errand when she claims to have witnessed the compromising situation referred to through

the partly-open hall door. Not only were the two servants liable to go directly in front of this "partly-open" door, through the hall, up to bed at any moment, but the husband might also return home at any hour and go into the parlor, through that hall, or up to his bedroom above the parlor. This house was neither a bawdy-house nor a brothel. It was the home circle, in which the wife had placed her little children, who, though upstairs, were certainly, in some degree at least, deterrents to any indecent conduct, on their mother's part, within that sacred precinct. In the bright light of that early hour of the evening, in the parlor, with its double doors opening into and towards the opposite double doors of the back room, and within easy view of the interior of that room, were two respectable persons, one being a sister of one of the accused parties and the other a reputable counsellor-at-law and her friend, both naturally interested in preserving the proper deportment of her young brother against the doing of a shameless act. Servants, also, were moving through the house with messages from the kitchen or on their way to bed through that hall, and open doors invited them to look in. Under all these circumstances of exposure, is it within the bounds of human probabilities that such an indecent act was then and there committed, and that, indeed, by a brother almost in his sister's presence? No other credible evidence in the cause affords the slightest warrant for placing these persons upon so debased a level of humanity as such an act would imply. Under the conditions stated, it was not possible for an adulterous act to have occurred there without detection by someone in that house, and with this certainty of detection, is it at all reasonable to suppose that this defendant, with the warning then already in her ears that her husband was contemplating divorce, would thus openly invite prompt and certain destruction of her marital rights, besides lasting disgrace to herself and her children?

I think that the testimony of Maria Mitchell, as to the commission of any adulterous act on the occasion she refers to, is unworthy of credit in and of itself, and without regard to the fact that she was contradicted by four unimpeached witnesses.

The second question of fact is, was adultery committed by the accused parties on November 5th, 1898? The only witness

who speaks as to this occasion is Detective Coyne. He was interested in the event of the suit, because he was confessedly employed to watch these persons, in order to carry forward his employer's design of obtaining a divorce, the success of which design probably depended upon the strength of the occurrences which the detective would swear he saw take place between them. He admits that he continued in the same employment up to and at the time his testimony was given in this cause. How closely the petitioner watched his testimony is disclosed by the master's notes of the evidence, in which it is stated that, at a point in the giving of his testimony, the petitioner interrupted the examination to correct an alleged misstatement of his witness. After a very careful consideration of this witness' evidence, I think that the facts he states are misleading, and that his inferences from them are colored and magnified, and that, unless we are justified in allowing suspicions to usurp the functions of facts, we must pronounce his evidence unreliable.

The following is the fair result of all his evidence relating to the incident of November 5th, 1898. He swears he went twice that night to the private dwelling-house of a gentleman named Graham Van Keuren, in the town of Bogota, some few miles distant from Jersey City, for the sole purpose of watching its inmates. The first time he arrived at the house about half-past seven o'clock, and saw there, he says, "Mr. Cane, Mrs. Brown and another lady, a boy [young Georgie Brown] and a girl" in the dining-room, but saw nothing else of any importance at that time. He then went away, and came back again about quarter-past nine. His only purpose was to see, in, of course, the most furtive way possible to a mere trespasser outside, what the inmates of the house did inside of the house that night, but as he had not been invited inside by the owner or occupants, and as there were strong reasons why he should not attempt to break in without invitation, he was, perforce, limited to what he could see and hear from the outside. It was cold and stormy weather, and the windows and inside shades over the windows were completely down, so that he was obliged to see, what he could see, through the windows covered by the window shades, and to hear, what he could hear, through the closed windows.

He swears that the side window, outside of which he stood in order to make his observations, was about at the top of his head, or a little less than six feet above the ground, and did not afford him sufficient chance to see or hear, so he had to resort to a rocking chair. I will quote his own words: "I found that the voices were rather inaudible; I could not hear as well as I would like to, and I took a cane rocking chair that I found on the front porch, placed it under the window and stood on it." By this means, he said, "his ear touched the frame of the window;" that, while standing on this rather precarious footing of a wicker rocking chair, with his ear touching the window frame, he observed the form of a woman, which, he says, "showed on the shade or curtain a sort of silhouette picture." Now, his evidence, and the whole of it, shows that this "silhouette" picture showing, or shadows on the window shade, constituted all the knowledge, either of the inmates of that room, or of their actions, which this witness did, or could possibly, derive by his eyesight from the situation he was in. He swears that his impression was that there was a light in the hall that lit up the room (but other positive testimony locates a lamp, lighted and covered by a dark-red shade, on a table at the side of the room next to the hall), and that he saw shadows of persons on the curtain. He could not see their countenances. His sense of sight was therefore of very little, if any, evidential value to him. He admits this distinctly in his cross-examination. He admits that he could see absolutely nothing through that shade by which to distinguish the defendant from any other woman. This is so important a statement that I quote the witness' own language on this subject:

"Q. Now, Mr. Coyne, why have you throughout your direct testimony referred to the female form which you saw and to the woman who came to the door as Mrs. Brown?

"A. *Because of the voice I heard; because I recognized it as Mrs. Brown's.*

"Q. *That is your only reason?*

"A. *That is all.*"

The remainder of his testimony (which is very long) makes it absolutely certain that his whole reliance for obtaining any

Brown *v.* Brown.

knowledge of the identity of the persons in the room, or of distinguishing Mrs. Van Keuren from Mrs. Brown, was upon his sense of *hearing alone.* He swears that, by his sense of hearing alone, he recognized Mrs. Brown's voice in the expression, "You naughty fellow." I stop to remark that even if he was correct in this surmise, and Mrs. Brown did use that language, it is of no sort of value on this question of the commission, or not, of adultery that night. Suppose Mrs. Brown did say in that room that night, "You naughty fellow," and suppose the remark was addressed to Cane, is it of the slightest consequence in the case? Is it anything more than the most ordinary expression of badinage in lively conversation? Is it not an address of constant occurrence in light and playful discourse between friends? But it was much more likely to have been the kind of raillery which a sister would address to a brother, and if the expression was used that night, it is just as probable that Mrs. Van Keuren used it toward her brother, as that the defendant made use of it. But this witness, when driven by cross-examination to admit that the shadows on the window shade gave him no certain method of distinguishing between the two ladies by his eyesight, made a desperate attempt to claim that he could recognize, in those three words "you naughty fellow," the tone of voice of a lady that he had never met. The following extract from his testimony will show this:

"*Q.* Had you become acquainted with Mrs. Brown?
"*A.* I had seen her on several occasions.
"*Q.* Where?
"*A.* On Glenwood avenue and the Boulevard before my employment.
"*Q.* Had you ever talked with her?
"*A.* No, sir.
"*Q.* Or she with you?
"*A.* No, sir.
"*Q.* How did you learn to know her voice?
"*A.* I saw different parties and heard her speak on several occasions; I saw a whole party come there on bicycles and I stood right near them.
"*Q.* How many?
"*A.* Four, five or six; they dismounted before the door.
"*Q.* Where was Mrs. Brown?
"*A.* One of the party.
"*Q.* What did she say?

"*A. I can't particularly recall; I didn't know she was Mrs. Brown at the time.*

"*Q.* And when was this?

"*A.* According to your question it was *before I was employed.*

"*Q. How was it according to the fact?*

"*A. True;* I couldn't say exact; it was some time in the warm weather; *it was some little before I knew anything about this case.*

"*Q.* And that was when you learned to know her voice, was it?

"*A.* I think so.

"*Q.* Did the whole party go directly into the house?

"*A.* They did; my impression is they all went in, *and were all talking; it is a hard matter to follow a large party.*"

I am loath to lengthen this opinion by this long extract, but it so certainly serves to show the dishonesty of the assumption of knowledge of this important witness upon so material an element of proofs, that I could not omit it in justice to the case.

But this extraordinary assumption of knowledge by this witness, from the *outside* of that house, of what transpired *inside,* on the night of November 5th, 1898, was not confined to his attempt to identify any particular person. He drew, also, conclusions from those shadows which necessarily involve the conduct and character of certainly three of the inmates of that house, and it becomes important to subject his evidence to further tests. He said (I condense his expressions) that, at about twenty minutes of ten o'clock, he saw shadows cast upon the window shade from some light which, he thought, but was not positive, was in the hall, which excited his suspicions and indicated, to his mind, that the person (a woman) was "partly undressed," and he proceeded to give certain details of the disarrangement of her clothing which, he says, he saw shadowed upon the window shade. Before adverting to the self-contradiction in his testimony upon this point, let us see what evidential value should be placed upon such appearances. It is a matter of common observation that grotesque shapes and figures, strongly resembling human beings or animals and birds and the like, can, at will, be thrown upon or against a curtain or shade by simply using and manipulating the two hands and the fingers as images interposed between a light and such shade. It would, it seems to me, be as reasonable to claim that the appearances of such odd forms through a shade was proof of the actual life

of such mythical creations, as the claim this witness makes that
the shadows he gazed upon should be relied on as evidence of
the existence of any certain forms of life behind the shade.   To
attempt to elevate to the dignity of proof in a court of justice
such misleading and fleeting eye-images, is to introduce an ele-
ment of startling uncertainty in the solemn trial of causes.   I
think no precedent can be found in such trials, before any court
of authority, approving or sanctioning such shadow-images as
proper elements of proof.   But there is in the evidence of this
witness, so far as it relates to the shadow-resemblance of either
Mrs. Brown or any woman there that night, in the condition
of undress he depicts, so serious a discrepancy and contradiction
that I shall take space here to present it.   In his direct exami-
nation he had stated that the woman he referred to had partly
undressed prior to Mr. Van Keuren's arrival, and had remained
in her guilty, disrobed condition up to the time her host entered
his house that night, at about five minutes of eleven o'clock.
Mr. Van Keuren was expected home from a shooting excursion
and his family knew that he might come in at any moment.
He (Van Keuren) testified that when he arrived and went into
his house he

"saw his wife and his brother-in-law [Cane] and Mrs. Brown in the little
reception-room adjoining the hall [referred to by Detective Coyne] ;   *that
Mrs. Brown was as fully dressed as he had always seen her, and that there
was no disarrangement of her dress in any way,* and no disarrangement
of her hair ;"

that he talked with these three persons for about *half an hour*
before Cane went home, which was about half-past eleven o'clock;
that he accompanied Cane to the door and that the ladies re-
mained in the hall.   Coyne admits that *Mr. Van Keuren came
in the house about a half hour before he (Coyne) left the house,
and that he (Coyne)* "did not notice any change of attire as to
the person he had referred to in his testimony until about five
or six minutes before he [Coyne] left the house." It is thus
apparent from the testimony of Van Keuren that this so termed
*"partly-undressed woman"* existed only in the imagination of
Coyne, unless we reject his own subsequent admission, to be

next quoted, and also the oath of Mr. Van Keuren. The evident inconsistency of Coyne's evidence must have struck the counsel of the petitioner as a serious fracture in the anatomy of the shadow creations, and he re-examined Coyne about this, and asked him the following question:

"*Q.* On your cross-examination there seems to be another discrepancy; you had been asked with reference to the change in the condition of the lady's dress and as to the rearrangement of her clothing, and had apparently stated it was rearranged before Mr. Van Keuren entered the house; you *afterward stated that you noticed the rearrangement of her dress about five or six minutes before you left the house;* what is the fact with reference to that?

"*A.* I couldn't say *anything about the arrangement of her clothing before Mr. Van Keuren came.*" •

Here, then, we find that when this witness is confronted by the inconsistency of his former statements, he is obliged to confirm the fact, sworn to by Mr. Van Keuren, that *"there was no disarrangement of Mrs. Brown's dress in any way."* So that it results that Coyne, after making positive assertions, seeking to convey the absurd impression that he could distinguish from the outside of that window, by means of the shadows cast from rays of light penetrating through two different shades (one of them being a dark-red shade, and therefore diffusing the rays in their passage through it), the difference between arranged and disarranged clothing of persons inside of that house, retreated from his position, after cross-examination, and, upon his re-direct testimony, was forced to the admission of the falsity of his previous evidence in that regard. When we weigh carefully the statements of the detective in their detail, they fail to convince the mind that he drew correct conclusions from the very few and misleading facts in his possession. On the contrary, it is apparent that he was prompted to supply the weakness of those facts by the strength of his inference from them, and that his testimony is so highly improbable that it must be held, when impugned, insufficient to support the charges intended. It should be added that the four inmates of that house, who must have had knowledge of the facts they affirm, explicitly contradict all the statements made by the detective which tend

to indicate that any misconduct occurred there, and, unless we deem them all to have been guilty of willful perjury, must prevail.

Almost all the rest of the very voluminous testimony in this cause, other than such as pertains to the two charges of adultery above considered, has been introduced and received in evidence for the purpose of showing an alleged improper intimacy with, and an adulterous disposition on the part of the defendant toward, the co-respondent. This evidence relates, to use the language of the opinion below, to "frequent meetings with more or less of opportunity to indulge illicit desires, if any they had, and acts of familiarity, such as kissing and embracing." But it will be found, I think, that such of these charges as have any foundation are readily susceptible, when the circumstances in which these two parties were thrown are considered, of a construction consistent with entire innocence. The friendly intimacy which existed between Mrs. Brown and the family of the co-respondent, Mr. and Mrs. Graham Van Keuren, to the latter of whom Mr. Brown had first introduced the defendant, naturally brought the defendant in socially intimate relations with Mrs. Van Keuren's young brother, the co-respondent. The defendant was five years older than he, and the mother of two children, and while she might admire his youthful conversation and even be charmed with his society, she would regard him so much her junior in years and experience that she could naturally feel that she might avail herself of his escort in bicycle rides about the country, and might invite him to her home, without giving grounds for any imputation of entertaining a lawless desire for his person. It would be a hard rule, indeed, that would compel a youthful wife, naturally fond of society, whose companionship a husband had rejected, without the slightest complaint or hint that she had failed in any of her home duties, or in the care of his children, to abstain from all the active pleasures of life, and immure herself from the world, because it might be charged against her that, in her husband's absence, she afforded herself "more or less opportunity to indulge illicit desires." The evidence upon this subject of improper intimacy emanates, with the exception of Coyne (the

distrust of whose testimony has already been sufficiently indi-
cated), almost entirely from servants of little character, whose
fairness and independence as witnesses are open to great sus-
picion. Indeed, the conduct of the petitioner toward one of these
servant witnesses throws so much light upon the methods he
has pursued to obtain evidence, and, at the same time, gives
such an insight into the character of the principal one of these
witnesses, Lizzie McCabe, that it should not be passed over.
She was discharged by the defendant from her service about
September 1st, 1898, upon an occasion soon to be adverted to.
At the time of her discharge she had declared to others that
she would "get even" with the defendant for discharging her,
and afterwards told another that she "had fixed Mrs. Brown."
She was afterwards produced as a witness by and on behalf of
the petitioner, and gave evidence before the master of an ex-
ceedingly hostile and malignant kind against the defendant. The
evidence as to the petitioner's meeting this McCabe witness is
referred to in the opinion below. It shows that he appointed a
meeting in New York City with her, and that she went from
Red Bank to New York City on August 29th, 1898, and met
the petitioner that night, at his apartments which he kept there.
This he has not denied in this cause, nor did he deny its truth
when his wife, who had heard of it, afterwards accused him of
having had Lizzie McCabe with him one night in New York.
According to her (McCabe's) declarations to others in evidence,
which, as against her, were competent, he told her he was going
to get a divorce, and took her to a theatre and to a wine dinner,
and "kissed her, and they had a very good time." She stayed
all night at his apartments, in his rooms there, and until eight
o'clock the next morning, and they came down to the ferry
together. In the opinion below, in referring to this meeting
of the petitioner with the McCabe witness, it is remarked: "It
may be fairly inferred that the petitioner did treat this witness
kindly, in order to induce her to tell him what she knew about
his wife's conduct."

While there may be no difference of opinion as to the general
propriety of a party in a cause treating his witness kindly to
secure the attendance of the witness in his behalf, in order to

Brown *v.* Brown.

tell what she may know, it must be conceded, I think, that the treatment by this party of this witness, instead of inducing her to tell what she *knew,* tended to lead her to tell what she *did not know.* It not only violated every rule of propriety as to the treatment to be observed by a master towards his servant, and by a party interested towards his witness, but it has every appearance of a corrupt intent to unduly influence her testimony in his favor. Legal testimony, especially in controversies involving the virtue of women, whose environments are easily susceptible of wrong constructions, does not consist alone in the statement of facts that are obvious to the senses of the witness, but is made up, to a very large extent, of the impressions and inferences which the witness' friendly or unfriendly disposition has led him or her to draw from facts. An unfriendly witness has the power to give to many acts, however innocent of wrong intent, a false coloring of criminality. Now, all the feelings of Lizzie McCabe, under this so-called kindly treatment, probably became enlisted in advance in favor of the petitioner and against the defendant, and the latter feeling was intensified by her immediate discharge by the defendant from her service. This state of feeling is plainly marked throughout her testimony. A single instance stated by this witness, and referred to at length in the opinion below, as evincive of self-conscious wrongdoing on the part of the defendant, will illustrate: On the Sunday afternoon during the last of August, 1898, when Mr. Brown went to Red Bank and there saw Mrs. Brown and Cane and others at the Bussell cottage, the witness testified that

"Will Cane and Mrs. Brown were both in the hammock, and Miss Bussell hollored to Mrs. Brown, 'Good afternoon,' and Mrs. Brown got up out of the hammock *quick* when she heard Mr. Brown's name mentioned."

That this was a false coloring she gave to the facts is not only evident from the testimony of all the five other persons who were there, but the petitioner himself, who certainly, in his frame of mind at that time, would have noticed so palpable a shouting out of his name and any guilty haste by the parties to change quickly their positions, has refused to confirm the truth of it by his own oath.

Soon after the meeting between petitioner and this witness in New York, he proceeded to obtain other sources of evidence, and employed Detective Coyne to watch his wife, with the object, of course, of ultimately producing him as a witness. There is, about this time, observable a very striking and suspicious coincidence in the dates of the employment in behalf of the husband, or by his detective for him, of the following-named house servants, who became important witnesses for him and very hostile ones towards the defendant: On September 9th, 1898, Rose Leary was employed as a servant in the defendant's house; on September 9th or 10th, Maria Mitchell; on October 14th, Rose Sexton, the evidence pointing strongly to the interference of the detective in her employment, and on November 1st, Maggie Meehan. This suit was begun (the affidavit being made on November 15th and the petition being filed November 16th, 1898), and the petitioner states in it that he had ceased cohabitation with the defendant on August 20th, 1898. He had, on August 29th, 1898, said to Lizzie McCabe that he was going to get a divorce, and his scheme must have taken well-matured shape at least from that date. He had, as early as the middle of that month, declared that "if he could get evidence enough for a divorce, he would take it."

I have, I think, sufficiently shown from the evidence the danger of reliance upon the witnesses above expressly named, and an examination of the testimony of any of the witnesses who were employed in that household after August 29th, 1898, will persuasively show their strong bias against the defendant and their general unreliability. No wife, however faultless her demeanor, could escape from the false coloring which impure or prejudiced minds—enlisted in advance against her—might impart to her every act, no matter how free from guilty intention such act may be. The mere taking upstairs of "a drinking-cup of hot water" at night before retiring, a simple and common remedy resorted to by thousands of sufferers from indigestion, was converted out of the mouths of such witnesses into a suspicious act, and the possession of a simple "syringe," a medical instrument almost indispensable for the health of every female,

was painted by their imagination with the blackest colors of impure intent.

In the very painstaking opinion below it is forcibly insisted that the opportunities (to which allusion will next be made) to indulge illicit desires with the co-respondent were created, or at least instigated, by the wife's conduct. But I think the evidence shows quite the contrary, and that the conduct of the husband led to and furnished the very opportunities out of which the only charges of adultery having any foundation in the evidence for support have originated. It should not escape notice that even so late as the middle of the month of August, 1898, the petitioner himself declared his belief in his wife's purity. Upon a very impressive occasion, about that time, he stated to a friend that he thought "Mame [his wife] was all right." He cohabited with her, as we have seen by his own petition, until August 20th, 1898, and, presumably, at that date believed her guiltless, and no adulterous act is seriously attempted to be shown by the proofs to have been committed until after the employment of the servant Mitchell and the detective, in October, 1898. The petitioner, after his meeting with the McCabe witness, described above, and securing her to testify against his wife, probably formed the plan of prosecuting the present suit. He soon employed the detective, and actively encouraged situations and opportunities, into which his wife unsuspectingly was led, in order that these very situations might of themselves be regarded and shown as evidence of her passion to seek the companionship of the co-respondent. The clearly-proved and undenied facts in this regard are that, some time about the 1st of October, 1898, the petitioner, when asked by his wife if he would take her to the theatre, declined to go with her, but said to her that he "did not see why she could not ask her best fellow," and upon her asking him, "Who is that?" he replied, "Will Cane." The defendant, naturally taking him at his word, arranged to go with Cane to a Newark theatre on the only two occasions on which they ever attended it together. On each occasion Mr. Cane was invited, with the knowledge and approval of the petitioner, to dine with him and his wife, and go with her from the house in Jersey City. He came in answer to the

invitation, and on both occasions (October 1st and 15th) dined with Mr. and Mrs. Brown at their table and in their house. On the first occasion, at their starting, they bid Mr. Brown good-bye in the house, and on the second occasion Mr. Brown actually accompanied them from the house and walked with them to the street car, going to Newark. Now, on these very occasions, the detective, who had been secretly employed by him, but unknown and unsuspected by them, followed them, and has, in this cause, testified to the facts of these two visits to the Newark theatre with great circumstantiality. Although the conduct of the wife, in extending to Mr. Cane invitations in these instances, was but the natural sequence of the husband's own suggestion and recommendation, this evidence has been used—strange to say—with great effect in the case to establish *"a strong disposition on the part of the defendant and her alleged paramour to be in each other's company."* Indeed, the facts presented in the whole case do not show that the wife, at any time or occasion, sought to avoid the society of her husband, in order to enjoy that of another; but, on the contrary, they tend to the conclusion that it was only after she had failed in her efforts to interest her husband in her pleasures, and to induce him to spend his evenings at home (he seems seldom to have come home before twelve at night), that she became interested in the society of the Van Keurens, the only intimate friends she had. This she did openly and not in a clandestine manner. It is a very significant fact that the husband has nowhere in the proofs shown that his wife, by or through any attempted concealment from him, arranged or appointed any meetings with the co-respondent, or that she, in any instance, disregarded any of his expressed wishes, or that she failed, in any degree, to show him the respect and affection due from a loyal wife. Her reputation, under the proofs, stands without a stain or blemish upon it, and nowhere in them has there appeared even a word used by her, either verbal or written, to indicate that she possessed a carnal mind toward the co-respondent, or the *will* to commit the crimes charged. In *Berckmans* v. *Berckmans, 1 C. E. Gr. 143 (1863),* Chancellor Green held that, "in order to prove adultery by circumstantial evidence, two points are to be ascertained and established—the *opportunity*

Brown *v.* Brown.

for the crime, and the *will* to commit it." His decision was affirmed by this court. *Berckmans* v. *Berckmans, 2 C. E. Gr. 453.*

The history of the lives of the parties to this suit for ten years prior to its commencement is given, in the defendant's evidence, in extended detail, and is undenied by the petitioner. That evidence shows, beyond room for the slightest doubt, that since certainly the close of the year of 1896, during which the second child was born, this husband had neglected his wife; that he had absented himself from her society to a very large extent; that he had left to her, unassisted by him, the care of their little children, and that he had given a large portion of his time, and apparently all his love and affection, to another woman. His generous gifts and unremitting attentions to the latter were as pronounced and constant as his cold neglect and studied indifference toward the former. He avoided the society of his wife, and estranged himself from her pleasures as well as her cares, with the inevitable consequence that the pleasures and companionships of her life became separated entirely from his pleasures and companionships. It is true that he supported her, but he did nothing else. From the undisputed evidence it is impossible to infer that he either loved or cherished her. The particulars of his conduct, other than already given, I shall not take the time and space to set down, but there is no escape from the conclusion that it had a direct and necessary tendency to furnish the very opportunities for suspicion which he now would turn against her, to his own advantage, and which have been, under the belief of the truth of those suspicions, commented upon and denounced in the opinion below. He spoke not a word of caution to her. He made no effort, even by a single hint to her (a hint which the most experienced in the ways of the world often need), to arrest her attention to the appearances of intimacy with the co-respondent, which he knew had excited some remark from another, nor to place before her even the slightest obstacle, designed or calculated to convince her, or even lead her to think, that he objected to her finding her pleasures in the companionship of her friends. On the contrary, as we have shown, he encouraged her to accept of the escort of Mr. Cane, on different excursions at night, in order that these very acts might, through the detective instrumentalities which

he had previously secured, and the aid of the testimony of servants of low character, be produced in evidence against her for the purpose of establishing her alleged carnal desire to seek the society of the co-respondent. In the opinion below it is said, in exoneration of the duty of a husband under the circumstances presented, that he was not "under any obligation to warn his wife of his suspicions and so put her on her guard." As the conclusions at which we have arrived on this appeal, and which I have endeavored to point out, do not rest upon the idea that the conduct of the husband has barred him from his right to maintain this suit, but solely upon the view that it helps and serves to explain the situations and opportunities in which his wife became involved, it will not be necessary to decide whether or not the rule as to the husband's conduct, above quoted, commends itself to the judgment of the court.

I think that, for the reasons stated, the decree below should be reversed, and the petition dismissed.

*For reversal*—THE CHIEF JUSTICE, VAN SYCKEL, DIXON, GARRISON, GUMMERE, COLLINS, FORT, GARRETSON, HENDRICKSON, BOGERT, KRUEGER, ADAMS, VREDENBURGH, VOORHEES, VROOM—15.

*For affirmance*—None.